## Oates *v.* Caffin.

Possession in another State of a slave who had run away from his master, a resident of this State, cannot be the basis of a possessory action here.   The possession continued in his master, whose rights remained unimpaired.   The law establishing that action is a real statute, and has no extra territorial operation.

A slave who absconds from his master steals himself, and stands as other stolen things, and neither possession nor title can be acquired to him.

The laws of this State on the subject of slaves, whether in the Civil Code or the Code of Practice, or in the ordinary statutes, being on the same subject, must be construed together and in such a manner as to give effect to all.

Art. 49 of the Code of Practice, authorizing possessory actions for slaves, is limited by the dispositions of the statutes relative to slaves and by the penal statutes, to such slaves as are not fugitive, or have not been stolen.

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J. *Prentiss* and *Finney*, for the appellant.   Art. 49 of the Code of Practice points out what is necessary to sustain the possessory action, and we have brought ourselves strictly within its provisions.   We have shown, in the first place, possession as owner for eight or nine years preceding the disturbance by the plaintiff.   According to a decision of the Supreme Court in the case of

*Ellis* v. *Prevost*, 19 La. 251, the running away of the boy did not interrupt our possessessory right, and could not interrupt nor divest it until some one should have maintained one year's adverse possession. The court, in that case, held that where there had been once real and actual possession of property, although the corporeal possession be abandoned, yet the mere intention to possess will keep alive the possessory right until some one has succeeded in holding one year's adverse possession. And the civil possession, preceded by the actual corporeal possession, will sustain the possessory action. Our actual possession, our immediate power, sustains our possessory right, unless one year's adverse possession can be shown. This cannot be pretended on the part of the defendant, for our suit was brought within less than a year after the boy ran away, and within a few weeks after the commencement of adverse possession.

*Labarre* and *Roselius*, for the defendant. Suppose a man's horse escapes from him, and is stolen while he is straying and beyond the control of his owner, in whom would the possession be laid in the indictment against the thief? The roman law lays down the doctrine on this subject with great clearness: Fere, quibuscumque modis obligamur, iisdem in contrarium actis liberamur: cum quibus modis adquirimus, iisdem in contrarium actis amittimus. Ut igitur nulla possessio adquiri, nisi animo et corpore potest: ita nulla amittitur nisi in qua utrumque in contrarium actum. § 153. ff. *dereg. jur. ant*. It is no objection to this rule to say that, under certain circumstances, the master may not only lose the possession, but also the ownership of a runaway slave, as when he is sold under the laws of the State where he is confined, &c. This is an exception to the general rule, resting on the necessity of the case; and the assent of the master, in those cases, is implied from his long silence. But there is another text of the roman law, still more explicit on this subject: Si servus, quem possidebam, fugerit; si pro libero se gerat, videbitur a domino possideri; sed hoc tunc intelligendum est, cum, si adprehensus fuerit, non sit paratus pro sua libertate litigare: nam si paratus sit litigare, non videbitur a domino possideri, cui se adversarium præparavit. D. l. 41, t. 3, l. 15, § 1. De *Usurpationibus et Usucapionibus*. The doctrine laid down in the case of *Ellis* v. *Prevost*, 19 La. 251, so far from conflicting with the position we have assumed, on the contrary, supports it. Would it not be absurd to insist that a thief could maintain a possessory action, because he had preserved the custody and control of the thing stolen for more than a year? It is a maxim as old as the law itself, that no one is permitted to invoke his own turpitude in support of a legal right.

The provisions of the Code of Practice are in perfect harmony with this view of the subject. Art. 49 declares that, in order to bring the possessory action, the party must have had the possession quietly, and without interruption, by virtue of one of the titles prescribed in the 47th article, &c. What are those titles? Either as owner, or usufructuary. Has the plaintiff shown that he possessed the slave in dispute, by either one or the other of those titles? Certainly not. For, independently of the unfavorable presumption which the facts of the case raise against him, he has not shown that he possessed the slave, as owner, for a single day.

In this case the judges being equally divided in opinion, the judgment of the lower court, under art. 68 of the constitution, is affirmed, each of the judges giving his separate opinion.

ROST, J. This is a possessory action; the subject, a fugitive slave. The facts are as follows: In 1833, the slave *Isaac* ran away from the defendant, who soon after advertized him, and offered a reward for his apprehension. Nothing was heard from him till the summer of 1846, when the jailor of Canton, in the State of Mississippi, advertized him as being confined in the jail of that place. The defendant went to Canton, took the slave out of jail, and brought him to New Orleans, where he resides. The plaintiff alleges, and has proved, that he was in possession of the slave, in the State of Mississippi, for eight or nine years, and until the 15th October, 1845, when the said slave ran away from him. He prays to be restored to his possession, and has appealed from the judgment rendered against him, in the first instance.

The possession of the plaintiff in the State of Mississippi, cannot be the basis of a possessory action. The law establishing that `action is a real statute, and we cannot presume that our legislsture has given to it an extraterritorial operation, more especially in a case like this, when the effect of that construction would be to give to the inhabitants of the State of Mississippi, rights which the legislature of their own State has no power to give them. The man *Isaac*, was held to labor under our laws, and the authorities of the State of Mississippi were at all times bound to deliver him to the party to whom the labor is due. The legislature of the State of Mississippi could not release the plaintiff from the obligation to deliver him, nor could the legislature of Louisiana take from the defendant the right to enforce the delivery. U. S. constitution, art. 4, sect. 2. *Prigg* v. *Commonwealth of Pennsylvania*, 16 Peters, 608. Story's Com. Con. U. S., vol. 3, p. 676.

Oates
v.
Caffin.

The possession of which our Code speaks is a possession in Louisiana, which the owner of the property can at all times contest. Should the law be otherwise, no one can possess a fugitive slave as owner.

Our laws regulating the condition of slavery are derived, through those of Spain, from the roman jurisprudence. The rule of that jurisprudence was that, the slave who absconds from his master steals himself, and that he stands as other stolen things, and neither possession nor title can be acquired to him. Servum fugitivum sui furtum facere, et ideo non habere locum nec usucapionem, nec longi temporis præscriptionem, manifestum est; ne servorum fuga dominis suis ex quacunque causa fiat damnosa. L. 1.Cod. De Serv.Fugit. The fugitive slave had no *situs.* The possession continued in his master, whose rights remained unimpaired. These rules were incorporated in the Spanish jurisprudence, and are found in law 23, tit. 14, Part. 7. Grégorio Lopez, in his commentary on that law, states at length the jurisprudence of Spain on that subject.

If a fugitive slave is to be viewed in law as if he had been stolen, the law of this case does not differ from that of *McGrew* v. *Browder*, 2 Mart. N. S. 17.

Our statutes on the subject of fugitive slaves are derived from the roman and spanish laws, and rest so manifestly on the same principles, that our predecessors have given effect to the statute against persons harboring them, in cases where the want of criminal intent in the party was apparent. *Rouquette* v. *Richardson*, 3 La. 452. This decision was made since the adoption of the Code of Practice. How could the defendant in that case have maintained a possessory action, when the court condemned him to pay damages for the possession, though unattended with criminal concealment.

We are told that the Code of Practice recognizes the possessory action for slaves, and that we are bound to give effect to its provisions. This is true. But we must also give effect to the other bodies of laws by which we are governed, and I am not aware that the dispositions of the Code of Practice are more imperative, or of greater public concernment, than those of the Black Code. Our different laws on the same subject must be construed together, and in such a manner as to give effect to all. The construction contended for by the appellant would justify a possessory action, even if the slave had been stolen. I cannot give it my assent. I believe, on the contrary, that art. 49 of the Code of Practice, authorizing possessory actions to be brought for slaves, is limited in its application, by the dispositions of the Black Code and of the penal statutes of the State, to such slaves as are not fugitive or have not been stolen.

I am of opinion that the judgment ought to be affirmed.

Eustis, C. J. concurred in the opinion of Rost, J.

KING, J.   The plaintiff held actual possession, as owner of the slave in contest, in the State of Mississippi, for more than eight years, and commenced this action within twelve months from the date of this disturbance.   If the controversy related to any other than a fugitive slave no doubt could be entertained of the plaintiff's right to recover.

In a possessory action, the question of property can never be enquired into. The plaintiff, who has possessed for more than twelve months previous to the disturbance, is not required to exhibit his title.   Possession for that length of time in good or bad faith, even as an usurper, accompanied by a claim of ownership, creates such a presumption that the possession is rightful as to dispense with the production of title.   C. P. arts. 49, 53.   C. C. 3417, 3418.   The proof necessary to sustain the action may be made by parol.   All the rules in relation to this action are expressly declared to apply to slaves.   C. P. 46.   I do not think that fugitive slaves form an exception to the rule.   No exception is declared, and I think none results from our legislation in regard to absconding slaves.   By our laws, the owner may not only be deprived of possession, but legally divested of title to his fugitive slave, without his knowledge or assent. Bul. and Cur. Dig. p. 791, §14.   The principle that the possession of the fugitive slave continues in the master ceases to apply, when the slave has been arrested and sold under the authority of law.   An adverse possession then commences. The slave is no longer to be regard as a fugitive, and could only be reclaimed in a petitory action.   In view of the law which thus permits title to be acquired to an absconding slave, the presumption cannot arise that, the possessor as owner for more than twlve months, is the possessor of stolen property; nor after such adverse possession can it be presumed that the slave is still a fugitive, and that the possession continues in the master.   The more legitimate presumption would be that, the adverse possession had been legally acquired.

If the plaintiff were claiming in a possessory action under ordinary circumstances, founded on a possession of more than a year in the State of Mississippi, the courts of this State would respect that possession and give effect to it, and not drive the party to his petitory action.   The case of McGrew v. Browder, 2 Mart. N. S. p. 17, was a possessory action, and the plaintiff relied exclusively on his possession in the State of Alabama, which prevailed.

The case appears to me to depend entirely on our own express legislation, which permits lawful possession as owner to be acquired of a fugitive slave, and which authorizes such possessor to assert his right of possession in an action of this kind, without exhibiting his title or explaining the origin of his possession.

I think that the judgment of the District Court ought to be be reversed.

SLIDELL, J.   Slaves are expressly declared to be subjects of the possessory action, and the general rules which control the action apply to them.   I am not aware that the law makes any distinction, and we are not permitted to make any.   In this action, it matters not whether a party possessed in good or bad faith, or even as an usurper; he is still entitled to the possessory action.   C. P. 49.   And in such an action the question of property cannot be examined.   Id. 53.   Civil Code, 3418.

But it is said that the slave who absconds, steals himself.   This may make the slave himself a thief, or may place him in the category of stolen things; but it does not necessarily make the person in whose possession he is afterwards found a thief, or even a receiver of stolen property.   By the roman law a person was considered a thief if he knowingly harbored or concealed the fugitive for the purpose of profiting by his services to the injury of his master.

It is worthy of observation that our Code expressly recognizes a slave as property, which one may acquire by *finding* and a possession of fifteen years. Arts. 3385, 3513.

Third persons may acquire the ownership of a stolen thing. For example, they may acquire the ownership of a stolen moveable by an uninterrupted possession for ten years, and this without being obliged to produce a title ; nor can their bad faith be set up as a defence. C. C. art. 3475. If the ownership of a stolen thing may be acquired, *a fortiori* it would seem that the possession of a stolen thing may be acquired.

Statutes of prescription are statutes of public repose. The law did not intend to encourage the receiving of stolen property, but to forbid men to be harrassed after the lapse of a certain time by the charge of being wrong-doers, inferring from a long possession its honesty and justice. The same motive, it seems to me, dictated the rules which control the possessory action. As it was desirable that after the lapse of a certain time questions of ownership should be put at rest, so it was also deemed desirable that, after the lapse of a certain time, questions of the right of possession should be put at rest. We cannot, in interpreting either system, make exceptions which the law has not made. In applying to the present case, the same presumption which the law accords to possessors in other cases, there seems to me nothing unreasonable. The slave may be a runaway, yet the possessor may have purchased in the best faith from a third person. He may even have acquired a perfect ownership by the authority of justice, under the laws of police which authorize the sale of unclaimed fugitives.

Gregorio Lopez, in his commentary upon the Seventh Partida, observes: Servi fugitivi non perdimus possessionem si tamen eam prosequamur ; si vero prosecutionem omittamus et non requiramas ubi sit, et servus deponit animum revertendi, tunc perdimus possessionem. What is thus said appears to me to refer to the relation of the master, and the fugitive, *inter se*. Pothier appears so to have considered it. In his treatise on possession he comments on the the principle of the Civil law. Nous perdons malgré nous la possession des choses mobilières, losqu'elles cessent d'être sous notre garde ; c'est-à-dire, lorsq'-elles cessent d'être dans un lieu où nous puissions les avoir quand nous le voudrons : Res mobiles, excepto homine, quatenùs sub custodiâ nostrâ sint, hactenùs possideri, id est quatenùs si velimus naturalem possessionem nancisci possimus. L. 3, § 13, ff. *de adq. poss*, Le droit romain exceptait de ce principe la possession que nous avons de nos esclaves. Nous étions censés conserver la possession d'un esclave fugitif, quoiqu'il ne fût plus dans un lieu on il fût en notre pouvoir de l'avoir quand nous le voudrions. La raison de l'exception est, que tout ce qu'un esclave a, meme la possession, appartient a son maitre ; la possession que cet esclave fugitif a de lui-même est une possession qui appartient à son maitre. Pothier, Traité de la Possession, no. 79, *and note*.

I do not perceive why the plaintiff's possession should be disregarded, because it was a possession in Mississippi and not in Louisiana. In applying the law of prescription it seems to me clear that respect must be accorded to possession, whether it be foreign or domestic. A question might be raised whether a title by prescription acquired in one country would be considered conclusive when the property is brought into another country, where a longer term of prescription is established. But I cannot think that the foreign possession should ever be deemed wholly inoperative, unless the lawgiver has so expressly declared.

OATES
v.
CAFFIN.

I cannot recognize the doctrine that any legislation of Mississippi whatever, which would affect the rights of the Louisiana owner of the fugitive, would necessarily be a violation of the constitution of the United States. The provision of the constitution pertinent to the matter, is as follows: "No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." This clause of the constitution should not be interpreted as interfering with the police power belonging to the other slave-holding States, in virtue of their general sovereignty. In virtue of that power Mississippi has full jurisdiction to arrest a fugitive slave in order to secure her own citizens against his depredations or evil example, and to sell him to pay the expenses of his prosecution or detention. So if the slave had committed murder and was convicted, it surely would not be a violation of the constitution by the State of Mississippi to hold the slave and execute him. See the cases of *Prigg* v. *Commonwealth of Pennsylvania*, 16 Peters, 624. *People* v. *Tompkins*, 9 Johnson, 70.

The constitution was not intended to enlarge the ownership of the master, but to protect it. It ought not therefore to be so construed as to confer upon the owner of the fugitive slave a higher ownership than he enjoyed in his own State. There are rights of the sovereign which are paramount to the rights of the citizen, and to which the latter must yield. If the slave had remained a fugitive in Louisiana, the public authorities could have arrested and sold him as a runaway, and divested the ownership of the master, by virtue of laws of police enacted for the general welfare. Why should not the State of Mississippi have the same right to protect her citizens, within her own limits?

The clause in the constitution must, therefore, be interpreted with reference to the evil which it proposed to remedy. Its object was to secure to the citizens of the slave-holding States, the complete right and title of ownership in their slaves as property, in every State in the Union into which they might escape from the State where they were held in servitude, to guard against the principles and doctrines prevalent in the non-slave holding States, by preventing them from obstructing or abolishing the rights of the slave holder. It certainly did not intend to clothe the ownership of the master with higher rights and attributes in another slave-holding State than he enjoyed in his own, or to exempt this species of property unqualifiedly from the operation of those general rules which are applicable to other kinds of property susceptible of being moved from place to place.

I think the judgment should be reversed.

*Judgment affirmed.*